Below is an opinion of the court.

TRISH M. BROWN
U.S. Bankruptcy Judge

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>MARA GISELLA HUTCHINS,<br><br>Debtor. | Bankruptcy Case<br>No. 19-31567-tmb7 |
| STATE OF OREGON, Department of Human Services,<br><br>Plaintiff,<br><br>v.<br><br>MARA GISELLA HUTCHINS,<br><br>Defendant. | Adv. Proc. No. 19-3086-tmb<br><br>MEMORANDUM OPINION[1] |

      This adversary proceeding came before the court for trial beginning on January 5, 2021,

and concluding on January 7, 2021.  Plaintiff State of Oregon, Department of Human Services

(the "State" or "DHS") was represented by Carolyn Wade and Belle Na; debtor Mara Hutchins

was represented by Laura Caldara and Amanda Bryan.  The State has asserted a claim against

Ms. Hutchins for overpayment of benefits under the Supplemental Nutrition Assistance Program

---

[1] This disposition is specific to this case and is not intended for publication or to have a controlling effect
on other cases.  It may, however, be cited for whatever persuasive value it may have.

Page 1 – OPINION

("SNAP").  In this proceeding the State seeks a ruling that Ms. Hutchins's liability for repayment of the SNAP benefits is non-dischargeable.

The trial lasted three days, included testimony from fifteen witnesses, and featured sixty-four documentary exhibits as well as one demonstrative exhibit in which a DHS employee demonstrated the user experience applying for SNAP benefits online.  I listened carefully to the trial testimony of witnesses, and have since reviewed the notes I took during trial, the recordings of witness testimony, the parties' memoranda, and the admitted exhibits.  In addition to examining the factual evidence, I have considered the parties' legal arguments and reviewed relevant authorities, both as cited by counsel and as located through my own research.  Based on my review and consideration, I have reached the decision set forth in this opinion.  The findings of fact and conclusions of law set forth herein constitute my findings and conclusions for purposes of Federal Rule of Civil Procedure 52(a) (applicable via Federal Rule of Bankruptcy Procedure 7052).

## I.  General Factual Background

Ms. Hutchins filed a voluntary chapter 7 petition on April 29, 2019, and received a discharge on August 27, 2019.[2]  On August 19, 2019, the State commenced this adversary proceeding by filing a complaint asserting two claims under § 523(a)(2).  The evidence received at trial generally establishes that Ms. Hutchins has led an extremely challenging life.  As the State readily admits, Ms. Hutchins suffered repeated trauma as a child, and as a result she has been diagnosed with post-traumatic stress disorder ("PTSD").  As an adult, Ms. Hutchins has struggled with mental health and substance abuse issues, although she has raised a family, met with professional success as a hairstylist, and has been sober since July 2017.  Ms. Hutchins also has several children,[3] and it is clear to me that Ms. Hutchins has worked hard to care for her children under difficult circumstances.  In an effort to provide for her children (two of whom have special needs), Ms. Hutchins has applied for, and received, SNAP benefits numerous times

---

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, title 11, United States Code.

[3] Although Ms. Hutchins testified about her family, she never stated how many children she has.  Based on documentary evidence, it appears that Ms. Hutchins has had between two and four children during the times relevant to this proceeding.

Case 19-03086-tmb    Doc 151    Filed 03/23/21

since 1999.  This adversary proceeding concerns the SNAP benefits that Ms. Hutchins received during the years 2013 through 2017.[4]

On July 3, 2013, Ms. Hutchins submitted an online application for SNAP benefits.[5] According to Ms. Hutchins's trial testimony, she submitted the July 2013 application right around the time that she opened a salon called Stylab Salon, LLC ("Stylab").  Ms. Hutchins continued to operate Stylab at all times relevant to this proceeding.  For some portion of this time, Ms. Hutchins also operated a beauty-product wholesale business called Shear Inspiration Style LLC, doing business as Sidlab ("Sidlab").  To maintain her SNAP benefits, Ms. Hutchins submitted additional applications each year from 2014 through 2017.  In addition, at roughly the midpoint of each benefit year, Ms. Hutchins was required to complete an "interim change report" focused on capturing major changes in household finances.

Ms. Hutchins failed to disclose her ownership of Stylab and Sidlab on her SNAP applications and interim change reports.[6]  She also failed to disclose her income from these businesses, and failed to list several bank accounts owned by her and/or her husband.  The State contends that these errors constitute misrepresentations sufficient to declare the SNAP overpayment nondischargeable under § 523(a)(2).  Ms. Hutchins argues that the omissions result from her PTSD, which "likely impacted her ability to accurately report factual information" to the State.[7]

## II.  Jurisdiction

I have jurisdiction to decide the claims at issue in this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).

## III.  Legal Standards

The State seeks a determination of non-dischargeability under both §§ 523(a)(2)(A) and (B).  As relevant here, § 523(a)(2)(A) excepts from discharge a debt "for money [or] property . . .

---

[4] Pretrial Order (ECF No. 92) ¶¶ (C)(15) through (24).

[5] *Id.* ¶¶ 16-17; Trial Exhibit A.

[6] Ms. Hutchins's first SNAP application did disclose income from Sidlab, but it stated that her income from the company ended on June 7, 2013.  Pltf. Exh. A at 5.  Despite this statement, Ms. Hutchins continued to report income from Sidlab on her tax returns in 2014 (Pltf. Exh. T at 6) and 2016 (Pltf. Exh. V at 8).

[7] Pretrial Order ¶ D(2)(j).

to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." To prevail on a claim under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that: (1) debtor made representations, (2) that she knew at the time were false, (3) with the intention and purpose of deceiving creditor; and, (4) that creditor relied on such representations (5) and sustained loss and damage as a proximate result.[8] A debtor's intent may be proven by circumstantial evidence.[9] Alternatively, instead of an affirmative misrepresentation, a creditor may prove that a debtor failed to disclose a material fact when the debtor was under a duty to disclose such fact and the omission was motivated by either an intent to deceive or a reckless disregard for the truth.[10]

Section 523(a)(2)(B) excepts debts from discharge that arise from the debtor's issuance of a false written financial statement. To prevail on a claim under § 523(a)(2)(B), a creditor most prove, by a preponderance of the evidence, that: (1) the debtor made a representation of fact respecting the debtor's or an insider's financial condition, (2) the representation was material, (3) the debtor knew the representation to be false at the time, (4) the false representation was made with intent to deceive the creditor, (5) the creditor justifiably relied on the statement, and (6) sustained damages as a proximate result.[11]

## IV. Analysis

Ms. Hutchins's trial presentation relied heavily (but by no means exclusively) on emphasizing the difficulties she has faced during her childhood and into her adult life. I cannot fault Ms. Hutchins for bringing her humanity into focus, and in some respects, her life story is relevant to the case at hand. But ultimately, I must decide this case based on applicable law and the facts presented at trial. It is well established that bankruptcy courts do not possess a roving commission to do equity. At all times, including when considering claims of nondischargeability, this court may only use its equitable powers to carry out specific provisions

---

[8] *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 373 (9th Cir. BAP 1997).

[9] *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir. 1989).

[10] *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246, n.4 (9th Cir. 2001); *Advanta Nat'l Bank v. Kong (In re Kong)*, 239 B.R. 815, 827 (9th Cir. BAP 1999).

[11] *Candland v. Ins. Co. of North Am. (In re Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996).

of the Bankruptcy Code.[12]  No provision of the Code grants me the power to discharge Ms. Hutchins's debt based on my sympathy for her.  Instead, I must apply established law, which I will proceed to do.

Citing recent Supreme Court precedent, Ms. Hutchins challenges the State's ability to seek a determination of nondischargeability under § 523(a)(2)(A).  The law of this circuit holds that §§ 523(a)(2)(A) and (B) are mutually exclusive.[13]  Ms. Hutchins points to *Lamar, Archer & Cofrin, LLP v. Appling*,[14] which holds that a written statement concerning a single asset is actionable under § 523(a)(2)(B).  Based on the holding of *Appling*, Ms. Hutchins argues that "[t]he statements at issue in this case are 'respecting [Ms. Hutchins's] financial condition' and as such, the State of Oregon cannot proceed on its 11 U.S.C. § 523(a)(2)(A) claim against her."[15]

Before ruling on this argument, I must first acknowledge that the State's theory of the case distinguishes which alleged omissions or misstatements support which claims.  The State argued at trial that Ms. Hutchins's failure to report the basic fact that she was self-employed constitutes an actionable omission under § 523(a)(2)(A), while her failure to report the amount of her income and certain bank accounts constitutes misrepresentation of financial details that is actionable under § 523(a)(2)(B).  With this distinction in mind, I hold that Ms. Hutchins's interpretation of *Appling* fails in light of the Supreme Court's own explanation of its holding.  The unsuccessful petitioner in *Appling* argued that requiring a creditor to use § 523(a)(2)(B) to attack a debtor's misrepresentation of a single asset would largely gut the applicability of § 523(a)(2)(A).  In rejecting this argument, the Court cited, with approval, two cases where debts based on an overpayment of public benefits were held nondischargeable under § 523(a)(2)(A) because the debtors made misrepresentations regarding their employment status.[16]

---

[12] *Saxman v. Educ. Credit Management Corp. (In re Saxman)*, 325 F.3d 1168, 1175 (9th Cir. 2003).

[13] *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 605-606 (9th Cir. BAP 1998).

[14] 138 S.Ct. 1752 (2018).

[15] Def. Tr. Brief (ECF No. 104) at 3-4.

[16] *Appling*, 138 S.Ct. at 1763, n.4 (*citing U.S. v. Tucker (In re Tucker)*, 539 B.R. 861 (Bankr. D. Idaho 2015) (holding overpayment of disability benefits nondischargeable under § 523(a)(2)(A) for debtor's failure to report a change in employment status) and *U.S. v. Drummond (In re Drummond)*, 530 B.R. 707 (Bankr. E.D. Ark. 2015) (same)).

I hold that the two cases cited by the Supreme Court are directly analogous to the State's allegations concerning Ms. Hutchins's concealment of her self-employment, and thus *Appling* does not prevent the State from using § 523(a)(2)(A) to challenge Ms. Hutchins's failure to disclose the fact that she was self-employed. In a slight departure from the State's arguments at trial, the Pretrial Order does contain some references to "income through self-employment" and omitted "assets" when describing the State's claim under § 523(a)(2)(A).[17] It appears that the State has abandoned these allegations, but to the extent that it has not, then Ms. Hutchins is correct that the State cannot use § 523(a)(2)(A) to attack quantitative misrepresentations regarding income or assets. But *Appling* makes quite clear that the alleged omissions regarding Ms. Hutchins's employment status are actionable under § 523(a)(2)(A).

Having clarified the contours of the State's § 523(a)(2)(A) claim, I now turn to the elements that the State must prove. I find no real dispute that Ms. Hutchins made representations to the State, that she was under a duty to answer truthfully, and that she omitted material facts regarding her self-employment. Ms. Hutchins's representations are contained in Plaintiff's Exhibits A through E (Ms. Hutchins's SNAP applications for 2013 through 2017), G through J (Ms. Hutchins's interim change reports for 2013 through 2016), and L (a summary of numerous verbal interactions between Ms. Hutchins and DHS). Although Ms. Hutchins challenges the accuracy of some of the summaries contained in Exhibit L (an issue that I will discuss later), she did not actively contest the fact that she made representations to DHS. At a theoretical level, the State's allegations could be classified as either misrepresentation or omission—Ms. Hutchins made extensive representations about her household finance, but failed to disclose her self-employment. This could arguably be considered a misrepresentation (by focusing broadly on the picture she presented to DHS) or an omission (by focusing only on the facts that were not disclosed).[18] The distinction does not change the outcome of my analysis. For simplicity's sake, I will use the five aforementioned elements of fraud under § 523(a)(2)(A), although later in this

---

[17] Pretrial Order ¶ E(1)(a).

[18] *See Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 65 (9th Cir. BAP 1998) (failure to disclose information that one is under a duty to disclose may constitute "a false representation of nondisclosure" under § 523(a)(2)(A)).

opinion I will analyze some facts under the "reckless disregard" standard used for material omissions.

Because the State has authenticated the documents in which Ms. Hutchins made representations regarding her eligibility for SNAP benefits, the State has satisfied the first element under § 523(a)(2)(A). The remaining elements are all disputed, and I will discuss them in turn. The evidence produced at trial focused almost exclusively on Ms. Hutchins's ownership of Stylab. Accordingly, the following analysis will focus on Stylab. Later in this opinion, I will separately address the allegations regarding Sidlab.

## A. Ms. Hutchins's Knowledge of Falsity

When addressing her knowledge of falsity, Ms. Hutchins latches onto DHS's rules for calculating self-employment income, emphasizing how difficult it can be for laypeople to understand the State bureaucracy. To be clear, some aspects of the rules are quite complicated, but to adopt Ms. Hutchins's framing would elide the more foundational and straightforward omissions that she made concerning the nature of her businesses and her employment. The issue here is not DHS's arcane rules regarding income calculation, but rather the meaning of a simple question: are you self-employed?

Ms. Hutchins formed Stylab on May 13, 2013 by filing articles of organization with the Oregon Secretary of State.[19] Sometime in 2013, Ms. Hutchins and her father signed a commercial lease for Stylab's place of business.[20] Ms. Hutchins testified that Stylab opened for business at approximately the same time as she submitted her 2013 SNAP application (July 2, 2013). On her personal tax returns for each year from 2013 through 2016, Ms. Hutchins reported Stylab's revenue (ranging from $24,759 to $156,099) and expenses (ranging from $37,379 to $136,481).[21] Ms. Hutchins testified that she was in charge of operating the salon, at which various hairstylists worked on a commission basis. In addition, Ms. Hutchins had her own chair, serving her own customers. She also testified, credibly, that in the early years of the salon, she

---

[19] Pltf. Exh. R.

[20] Pltf. Exh. KK. The lease does not indicate the date on which it was signed, and Ms. Hutchins testified that she could not remember the date of signing; however, the lease term began on July 1, 2013, so presumably the document was signed sometime before that date.

[21] Pltf. Exhs. S at 6-7, T at 4-5, U at 5-6, and V at 6-7.

took the money she earned from her customers and deposited it into the general operating account to cover the business's overhead expenses. As a result, even though Ms. Hutchins was seeing customers, she testified that she did not personally receive and retain compensation from Stylab until "maybe 2017 or '18," at which point she started receiving a $500 monthly draw. During the years between 2013 and 2017, Ms. Hutchins failed to disclose her ownership of Stylab on her SNAP applications[22] or interim change reports.[23]

When testifying at trial, Ms. Hutchins described Stylab as a type of partnership between herself and her father, stating that "My dad had offered to help me kind of get started on a business and own a salon." According to Ms. Hutchins, her father loaned her money to start the business, which lead to her confusion about how to report her ownership: "This money was from my dad, in my mind—especially during this time—it was my dad's business, it wasn't mine until I paid back the loan . . . . He was like a silent partner, but on paper it was mine." At a different point in her testimony, Ms. Hutchins stated "My dad didn't want legal ramifications if something horrible happened. But he has said he's like a silent partner, he just didn't want to be on paper."

I find Ms. Hutchins's testimony about her perceptions of her ownership to be credible, but at the same time, this testimony supports an inference that she knew her representations to DHS were false. The SNAP application and interim change reports both contained similar certifications, signed by Ms. Hutchins, that the applicant has given "complete" information. But Ms. Hutchins acknowledged that she owned the business "on paper," at least in part because her father wanted to avoid the "ramifications" of owning the business. The inescapable result of this logic is that Ms. Hutchins was the record owner of the business, and one of the resulting ramifications for her is that she is obliged to report Stylab as her business when agencies such as DHS require her to provide complete information about her employment.

This finding is further strengthened when I examine the specific statements Ms. Hutchins made to DHS. There were four interim change reports, each of which asked if anyone in the applicant's household was self-employed. Following the self-employment question, the form contains space to report each household member's hourly wage, but there are additional lines

---

[22] Pltf. Exhs. A at 5-7, B at 5-6, C at 5-6, D at 5-6, and E at 5-6.
[23] Pltf. Exhs. G, H, I, and J.

where an applicant can provide details about a household member's compensation if that person is not paid hourly. I believe Ms. Hutchins's testimony that she did not personally draw a salary from the salon (at least in the early years), however the interim change report contained plain-language questions and provided space for her to disclose that she worked at her own business but was not drawing a salary due to its marginal profitability. For Ms. Hutchins to simply omit any reference to the business bespeaks an intentional withholding of material information, and her own testimony suggests that she must have been aware of this misrepresentation because she admits to being the business owner "on paper."

Furthermore, Ms. Hutchins's own description of her role at Stylab is irreconcilable with some of the representations she made to DHS as part of the SNAP application process. At trial, Ms. Hutchins stated that she saw her role at Stylab as follows: "In my mind, it's been my dad's salon, and I worked there. On paper, yes it is mine, but until those loans are paid off, it is not my salon." I found Ms. Hutchins's testimony in this respect to be believable, but it is highly probative that when asked to use her own language, she admitted to *working* at the salon. True, Ms. Hutchins performed this work for many years without receiving cash compensation, but she did receive other consideration for her work and she had no difficulty articulating the economic dynamic at play: her father provided the start-up funding, and rather than receiving a salary, Ms. Hutchins worked to pay back her father. Once the loan was repaid, the salon was to be hers. With this firm grasp on the structure of her business, I thus find that Ms. Hutchins must have known it was false to repeatedly tell DHS that she was not working.[24]

## B. Intent to Deceive or Reckless Disregard for the Truth

As in most cases of alleged fraud, Ms. Hutchins did not overtly proclaim her intent while applying for SNAP benefits. Accordingly, the State points to circumstantial evidence.[25] In

---

[24] In addition to the five SNAP applications and four interim change reports that all failed to disclose Ms. Hutchins's self-employment, the record contains three instances of similar oral misrepresentations made during eligibility interviews conducted by DHS. *See* Pltf. Exh. L at 26 (June 26, 2014 eligibility interview stating "Mara reports husband Brian is the only person [in the household] currently employed"), 20 (June 19, 2015 eligibility interview stating "Mara reports not currently not employed [*sic*]"), and 15 (June 23, 2016 eligibility interview stating "No one in the household is working").

[25] *See First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421, 424 (7th Cir. 1985) (intent to deceive may be logically inferred from a representation that debtor knows will be relied upon by the recipient in a transaction).

response, Ms. Hutchins takes a scattershot approach to challenging the State's evidence of intent. Ms. Hutchins's counsel began by suggesting that the SNAP application could have been confusing or challenging to complete for an applicant who was intoxicated. Ms. Hutchins, for her part, testified that she was using illegal drugs during the years in question, but she could not recall if she was impaired during the specific times when she completed DHS paperwork. This line of argument lacks merit because it is the applicant's duty to answer questions honestly and forthrightly. There is no evidence that any of Ms. Hutchins's SNAP applications were submitted under duress or during exigent circumstances. As explained later, I find that Ms. Hutchins is intelligent and capable when she is sober. If she chose to complete the applications when she was not sober, this would constitute reckless disregard for the truth, not a defense to fraudulent intent. On the other hand, Ms. Hutchins's allegations regarding the impact of her mental illness[26] are colorable, and deserve careful consideration. I will address the State's evidence and Ms. Hutchins's defenses separately.

### 1. Circumstantial Evidence Indicates that Ms. Hutchins Intentionally Concealed Her Employment Status from DHS

Ms. Hutchins testified at trial that she recalled a conversation with a DHS employee who allegedly provided her with guidance on how to report her work at Stylab. Although Ms. Hutchins could not recall the date of this conversation or the name of the DHS employee, she testified that it took place sometime in 2013, she recalls it lasting roughly 90 minutes, and the employee (who was female) took notes of the conversation. As for the contents of the discussion, Ms. Hutchins testified, "[I] said that I had a salon, that I worked 40 hours a week at least, but I didn't get paychecks, there was absolutely no positive money coming in." In Ms. Hutchins's telling, the DHS employee "said something like 'So, it's like you're a volunteer,' and I was like 'Yes, that's absolutely—— Because I'm spending all this time here, but I'm not making anything.' But I wanted her to know that I'm not just sitting at home not doing anything. I'm really trying to do something." In regards to her SNAP benefits, Ms. Hutchins testified that the DHS employee said: "Once I made over X-amount of dollars—and I don't remember the exact amount, I think it was like twenty-three hundred or something, I don't remember—that that's

---

[26] Pretrial Order ¶ E(b).

when it would change or adjust my case, and to make sure that I let them know as soon as I made over X-amount of dollars."

More generally, Ms. Hutchins testified that she did not consider herself as receiving income from Stylab because she did not personally receive any portion of the business's net profits. At least as far as 2013 and 2014 are concerned (when the business was making no, or minimal, profits) this perception may excuse Ms. Hutchins's failure to report monthly income from the salon; however, it does not adequately explain why Ms. Hutchins failed to report the basic fact that she worked at a business that she owned. Indeed, based on the totality of facts and circumstances, I find that Ms. Hutchins concealed this information with intent to deceive DHS. I base this finding on four separate pieces of circumstantial evidence. None of these findings, standing by themselves, are dispositive, but cumulatively they are sufficient for me to infer that Ms. Hutchins intentionally concealed the details of her business ownership from DHS.

First, I find that Ms. Hutchins has not sufficiently proven that a DHS employee told her to not report her work at Stylab, or to report it as volunteer work (the so-called "volunteering discussion" described two paragraphs above). Although Ms. Hutchins testified at trial that she could not recall the precise date of the alleged volunteering discussion, she had previously told DHS that it took place as part of her SNAP eligibility interview in July 2013.[27] The notes taken by the DHS employee who conducted that July 2013 interview do not corroborate Ms. Hutchins's account.[28] Although Ms. Hutchins's counsel tried mightily to cast doubt on the accuracy of the notes kept by DHS workers documenting interactions with Ms. Hutchins, I find that testimony from multiple State witnesses (including the authors of some such notes) established the general reliability of these notes, which are collected in Plaintiff's Exhibit L. It is true that the notes are not verbatim accounts, so the absence of such a discussion from the July 2013 notes does not definitively establish that the discussion did not take place, but the notes do generally corroborate the State's version of events. Furthermore, four different DHS employees testified about training that SNAP eligibility workers receive, and this testimony persuades me that the training is thorough and consistent, and it is vanishingly unlikely that a DHS worker who

[27] Pltf. Exh. L at 3.
[28] *Id.* at 35-36.

received such training would tell any applicant to report their own business as a volunteer activity. Furthermore, Ms. Hutchins claims that the DHS worker affirmatively told her to not report her self-employment income until it exceeded the supposed threshold figure (the number that Ms. Hutchins cannot remember). Based on the cumulative testimony concerning DHS's employee training, I find that this particular statement is so starkly contrary to DHS's policies and practices that it is almost certainly not an accurate representation. There may be a basis in fact for Ms. Hutchins's perception of the July 2013 discussion, but she has not produced evidence establishing that her version of events is more likely than not to be accurate.

Second, even if one were to believe Ms. Hutchins's account of the volunteering discussion, her answers on the SNAP applications and interim change reports still indicate an intent to withhold material information from DHS. According to Ms. Hutchins, she was under the impression that self-employment income only impacted her SNAP eligibility if it was over a certain dollar amount, but she could not recall the specific amount. If that were her understanding, then it would have been incumbent upon Ms. Hutchins to report Stylab's income so that DHS could then determine whether she was above or below the threshold that she herself was unable to remember. Indeed, as the State demonstrated, applicants could submit (and the State would process) SNAP applications that disclosed employment activity but contained no information on the amount of income associated with such employment. If Ms. Hutchins were confused about how to compute her income, one would have expected her to report Stylab as her employer, with either no income or a narrative explanation.[29] But this is not what she did. Instead, she concealed her work at Stylab, even though she admits to not remembering the amount of the income threshold that she thought governed her eligibility. This omission denied DHS any type of inquiry notice as to this source of income and further deprived DHS of the opportunity to ask clarifying questions. Given Ms. Hutchins's concession that she did not know what the relevant income threshold was, her concealment of facts that would have allowed DHS to determine whether she was over the threshold indicates an intent to deceive the State.

---

[29] As discussed later, Ms. Hutchins provided such a narrative explanation when asked about her employment in a different context. *See infra*, text accompanying notes 45 through 47.

Third, Ms. Hutchins's testimony regarding what she told DHS is contradicted by documentary evidence. Ms. Hutchins stated at trial that "I did tell them [DHS] that I had a salon that I worked at, and I didn't get paychecks. I pretty much am certain that I said that every year." Yet this characterization is contradicted numerous times in the record. None of Ms. Hutchins's SNAP applications disclosed the existence of Stylab. Most telling is one of the few documented instances where Ms. Hutchins did reference "volunteer" work. During a June 19, 2015 eligibility interview, a DHS employee noted that Ms. Hutchins reported being "currently not employed" but that "she's volunteering time in *a salon* but in [*sic*—should be 'is'?] not being paid."[30] I find this phrasing to be significant: under any common understanding, the word "volunteer" encompasses the idea of offering something *to a recipient* without the expectation of compensation.[31] In Ms. Hutchins's situation, there was no recipient of her offer of gratuitous labor, because she was working for herself.[32] Indeed, based on the trial testimony concerning DHS's SNAP eligibility training, it is obvious to me that Ms. Hutchins knew that if she had spoken of "volunteering in *my* salon," this would have inevitably triggered follow-up questions from DHS's employees. Thus, her choice to obscure the nature of the work by misleadingly referring to "a" salon further bespeaks an intent to conceal material information from DHS.

Fourth, based on Ms. Hutchins's experience receiving public assistance, it is not credible to suppose she would have been unaware that her self-employment activities were critically

---

[30] Pltf. Exh. L at 20 (emphasis added). In addition to this interview, there are two other documented instances of Ms. Hutchins disclosing her "volunteer" work. She reported 30 hours of volunteer work per week (with no additional details) on her December 2016 interim change report (Pltf. Exh. J at 4); and after DHS notified her of a potential overpayment, Ms. Hutchins described her recollection of the alleged 2013 "volunteering discussion" (Pltf. Exh. L at 10).

[31] For example, Webster's Third International Dictionary defines the verb form of "volunteer" as "to offer oneself as a volunteer." There cannot be an offer without another party to receive it. The same dictionary lists the noun form as, among other things, "one who renders a service or takes part in a transaction while having no legal concern or interest." A transaction generally requires more than two parties.

[32] A lawyer may be tempted to disagree with this characterization, since Stylab was actually operated as an LLC, which is a distinct entity under the law. But Ms. Hutchins's testimony made clear that she—like many laypeople—did not view this closely-held LLC as an actual independent entity. Rather, she "looked through" the LLC and characterized Stylab as either owned by herself, "on paper" (what lawyers would call legal ownership); or by her father, who provided the startup funds (what lawyers would call equitable ownership). To the extent that Ms. Hutchins thought she was working for her father, that work cannot accurately be described as volunteering, since she received consideration (in the form of loan repayment) in exchange for her work.

important to the DHS's eligibility determination.  In 2012, Ms. Hutchins endured a contentious administrative adjudication regarding her eligibility for childcare benefits administered by DHS. The key issue in that proceeding was the impact that her self-employment activity had on her eligibility.[33]  Ms. Hutchins tries to distinguish the 2012 controversy from the present case by arguing that her earlier self-employment was working in a hair salon that she did not own, and for which she received actual cash payments (unlike Stylab, which generated revenue, but no direct payments to Ms. Hutchins).  But this distinction does not adequately explain the omissions from Ms. Hutchins's SNAP applications.  Ms. Hutchins testified that the money to start Stylab came from her father, and she thus viewed her father as a "silent partner" while "on paper it [the business] was mine."  But the very fact that she was a business owner "on paper" should have led Ms. Hutchins to report her ownership of Stylab, even if only to explain that the business provided her with no income.  This fact is even more compelling when taking into account Ms. Hutchins's previous experience with DHS: during the course of the 2012 dispute, Ms. Hutchins learned that DHS measured self-employment income by referencing schedule C of her Form 1040 individual tax return.[34]  While Ms. Hutchins did not prepare her own tax returns, her accountant testified that Ms. Hutchins was actively involved in the return preparation and filing process; thus, it strains credulity to think that Ms. Hutchins was not aware of the schedule Cs filed in 2013 through 2017, which showed significant gross revenue attributed to her two businesses.  The discrepancy between her reporting such income to the IRS while failing to report the basic existence of the businesses to DHS further supports an inference that Ms. Hutchins acted out of a desire to conceal information from the State.

Having found that the evidence establishes an intentional omission, I turn next to Ms. Hutchins's argument that her mental illness prevented her from forming intent due to cognitive limitations.

---

[33] *See* Pltf. Exh. L at 43.
[34] Pltf. Exh. L at 39.

## 2.     The Available Evidence Does Not Corroborate Ms. Hutchins's Characterization of the Impacts of Her Mental Illness

Throughout the pendency of this proceeding, Ms. Hutchins has repeatedly sought to blame any misrepresentations on her PTSD, alleging that this condition prevents her from comprehending "complex" forms. Both parties focused intensely on this issue at trial. After carefully considering the evidence, I find that Ms. Hutchins's allegations are unsubstantiated.

I begin with Ms. Hutchins's own testimony. She did testify to being unclear about the overall process of applying for and obtaining SNAP benefits (a completely credible assertion, given the labyrinthine nature of DHS's policies and procedures). But she did not testify to being confused by any specific question asked on the DHS forms or in interviews. Instead, when faced with questions from DHS's counsel regarding the SNAP applications, Ms. Hutchins provided clear and articulate explanations of why she provided certain answers to specific questions. Some of her explanations (such as not thinking she had income from Stylab when she received no take-home pay) are credible. Other explanations (such as claiming that she thought of herself as a "volunteer") are less plausible. But the point here is that Ms. Hutchins did not retreat from counsel's questions or profess ignorance; rather, she comprehended the questions, formulated a reasoned position, and defended it—all in the stressful context of being questioned by counsel for an adverse party in litigation. She was even able (on the fly, and without assistance from her own counsel) to correct DHS's counsel when she believed counsel was inaccurately summarizing evidence from the record. Accordingly, Ms. Hutchins's behavior suggests to me that she had little difficulty in accurately comprehending the comparatively straightforward questions posed by DHS during the SNAP application process. This conclusion is, however, subject to two caveats: first, the court lacks psychological expertise; and second, by the time of the trial Ms. Hutchins had had time to familiarize herself with the issues in dispute. I will thus consider additional sources of evidence that can fill in these two gaps.

Clinical information concerning the impacts of Ms. Hutchins's PTSD was provided by two expert witnesses. The State retained Dr. Molly D. Persky, a licensed psychologist and certified forensic evaluator, to conduct an independent psychological examination and testify regarding her findings. Ms. Hutchins offered the testimony of her therapist, Bekah Stines, a

licensed professional counselor.[35]  I find that the evidence offered by Dr. Persky and Ms. Stines sufficiently establishes that the omissions on the SNAP applications were not caused by Ms. Hutchins's PTSD.[36]

Dr. Persky based her testimony on an eight-hour examination that she completed under a court order authorizing an independent psychological examination pursuant to Federal Rule of Civil Procedure 35.[37]  Obviously, because Dr. Persky is retained by the State for purposes of this litigation, she is not a completely disinterested party.  Nonetheless, her testimony satisfies me that she conducted her exam by using generally accepted tools and procedures from the psychological discipline in order to evaluate the impact of Ms. Hutchins's PTSD via objective methods.  Dr. Persky's expert report explains that Ms. Hutchins "is a highly intelligent individual who is able to comprehend and express verbal and written language . . . [and] is highly skilled at pattern recognition, abstract reasoning, attention to detail, and interpreting and manipulating complicated visual information accurately."[38]  She also found evidence suggesting that Ms. Hutchins may exaggerate the symptoms of her mental illness.  While testing did not conclusively establish malingering, results did indicate "exaggeration of symptoms."[39]  In synthesizing the evidence gathered as part of her evaluation, Dr. Persky confirmed Ms. Hutchins's "genuine

---

[35] Ms. Hutchins also offered the testimony of an additional purported expert witness, Rebecca Bloomfield, but that testimony plays no role in my decision because Ms. Bloomfield spoke only of generalized issues and admitted that she had no knowledge of any of facts that are of consequence in deciding this dispute. Indeed, because of Ms. Bloomfield's complete unfamiliarity with any facts that bear on the claims or defenses in this case, it seems that the only point of her testimony was to provoke an emotional response from Ms. Hutchins who was visibly (and understandably) distressed by having to listen to Ms. Bloomfield gratuitously describe, in salacious detail, the general type of trauma that Ms. Hutchins suffered as a child. Thus, Ms. Bloomfield's testimony was not only irrelevant, but its production at trial appears to have worked emotional harm on Ms. Hutchins.

[36] The parties spent considerable time at trial arguing over the distinction between PTSD (the diagnosis assigned by Dr. Persky, based on the criteria in the Diagnostic and Statistical Manual (5th ed.)) and complex PTSD (the terminology used by Ms. Stines, based on the International Classification of Diseases (11th revision)).  Ultimately, this distinction may be meaningful in a clinical setting, but it is not relevant in this proceeding.  The court's task is not to assign a diagnostic label to Ms. Hutchins, but rather to determine the impact that her condition has on her ability to understand and truthfully answer questions. Due to their different credentials, Dr. Persky is able to make a diagnosis, whereas Ms. Stines is not. Accordingly, I will use the terminology of Dr. Persky's diagnosis (i.e., PTSD) when discussing Ms. Hutchins's mental illness.

[37] *See* ECF No. 79.

[38] Pltf. Exh. DD at 3.

[39] *Id.* at 2.

mental health difficulties," but also stated "the evidence of exaggeration calls into question the veracity of her reporting."[40]

Dr. Persky's trial testimony helped to elaborate on her finding regarding exaggerated symptoms, and I find this testimony to be instructive. Dr. Persky based her finding on the results of two tests. First, the Miller Forensic Assessment of Symptoms Test rendered a score that was somewhat equivocal—although the score "does not indicate that [Ms. Hutchins] was attempting to malinger symptomology," Dr. Persky also noted that the score was high enough that Ms. Hutchins's "responses may be indicative of overexaggeration of mental health symptoms."[41] Second, Dr. Persky administered the Minnesota Multiphasic Personality Inventory-2- Restructured Form ("MMPI"), a widely used test that is frequently relied on by courts when evaluating psychological evidence. Dr. Persky was unable to score the results of Ms. Hutchins's MMPI because the answers "indicated that she reported a considerably larger than average number of somatic symptoms rarely described by individuals with genuine medical conditions. This level and type of infrequent responding is uncommon even in individuals with substantial medical problems who report credible symptoms."[42] Dr. Persky adds that Ms. Hutchins's answers "very likely indicate[] non-credible reporting of somatic symptoms" and are also "associated with non-credible reporting of cognitive symptoms."[43] At trial, Dr. Persky provided persuasive testimony, based on scientific research, that the results of her examination are highly likely to accurately measure Ms. Hutchins's cognitive abilities during 2013-2017, even though the exam was conducted in 2020.

Ms. Stines's testimony is markedly different, beginning with her own characterization of her role. Ms. Stines testified on direct examination that she prepared her expert report and testified at trial in order to "help support and advocate for her [Ms. Hutchins] on her behalf." On cross-examination, Ms. Stines affirmed that "in this particular situation" she was acting as an advocate for Ms. Hutchins. As a mental health professional who depends on establishing and

---

[40] *Id.* at 4.
[41] *Id.* at 13.
[42] *Id.* at 16.
[43] *Id.*

maintaining rapport with Ms. Hutchins, the existence of mutual trust is undoubtedly a critical part of Ms. Stines's clinical work. Her desire to support and advocate for her clients is laudable. But in the context of litigation, it impairs her usefulness as an expert witness. Ms. Stines was called to testify whether Ms. Hutchins's characterization of her mental illness was accurate.[44] It is difficult to conceive of a situation in which a therapist/advocate in Ms. Stines's position would risk destroying patient rapport by contradicting her patient in a trial setting. Ultimately, when Ms. Stines testifies that she finds Ms. Hutchins's self-assessment credible, the court is unable to determine whether this opinion is based on clinical expertise or on a desire to advocate for Ms. Hutchins and strengthen the therapist-patient bond. Accordingly, I give little weight to Ms. Stines's opinion testimony. I do, however, find some of the factual components of her testimony to be noteworthy.

Ms. Stines provided compelling testimony regarding the impacts of Ms. Hutchins's trauma. Specifically, Ms. Stines spoke of Ms. Hutchins's recurring flashbacks, exaggerated startle response, and occasional periods of dissociation. But Ms. Stines only spoke of these symptoms in general terms, and did not relate them to Ms. Hutchins's experience applying for SNAP benefits. Similarly, while Ms. Hutchins herself testified regarding dissociative events, she did not state that she experienced any flashbacks or dissociation during her interactions with DHS. Thus, while the evidence concerning the difficulties Ms. Hutchins experiences as a result of her PTSD evokes sympathy for her, these types of generalized symptoms do not provide information relevant to the ultimate question of Ms. Hutchins's intent.

When asked on direct examination whether she believed that "Ms. Hutchins's complex PTSD likely impacted her ability to accurately report factual information," Ms. Stines responded affirmatively, based on her observations from the time period when Ms. Hutchins first became her patient. Ms. Stines said that during that time Ms. Hutchins was disorganized and frequently did not complete paperwork. Ms. Stines gave one specific example of Ms. Hutchins's difficulty with forms: an "outcome based self-assessment form" which Ms. Hutchins completed by simply

---

[44] *See* ECF No. 71 ("Ms. Stines will testify. . . about . . . the impact of Ms. Hutchins' complex trauma on her daily life including her ability to accurately disclose factual information, accurately respond to forms, and her cognitive ability during the years in question in this case.").

replying "yes" to all the questions without understanding the contents. While this example is probative, I find that it does not prove that Ms. Hutchins was unable to comprehend or accurately complete forms. I base this finding on three observations.

First, based on Ms. Stines's description of this incident, it appears that Ms. Hutchins was not familiar with the purpose of the outcome based self-assessment form until Ms. Stines provided an explanation. Accordingly, this particular example is materially different from the SNAP applications, where Ms. Hutchins clearly understood the purpose and had experience with completing the same form numerous times in the past.

Second, the behavior described by Ms. Stines (i.e., providing a blanket answer to all questions regardless of actual answers) is not consistent with how Ms. Hutchins completed her SNAP applications and interim change reports: those documents were not mostly blank (even though DHS would have accepted such a filing) nor did Ms. Hutchins simply respond to questions by providing the answer that would have avoided the need to answer follow-up questions (in DHS's online SNAP application, a "yes" response often triggers additional subsidiary questions, while a "no" response often avoids follow-up questions). Instead, Ms. Hutchins completed the SNAP forms by providing detailed information about the members of her household (including demographic information) and sources of non-employment income (such as child support and renting out a room in her house). The answers on Ms. Hutchins's SNAP forms indicate a comprehension of detail and an ability to provide information, *except for* the consistent omission of her self-employment status.

Finally, while the outcome based self-assessment form is not in the record, other paperwork from Ms. Stines's office is, and I find some of these forms to be particularly instructive. Ms. Hutchins completed an "Adult Intake Form" for the clinic where Ms. Stines works on December 5, 2017.[45] The form is five pages long and asks about numerous aspects of Ms. Hutchins's life, including medical history, family relationships, employment, and personal hobbies. Ms. Hutchins answered all sections of the form in thorough detail, in her own handwriting. In a section captioned "Social/Cultural Information," the form contains the

---

[45] Pltf. Exh. EE, at 10-14.

following questions (printed here in Roman type), with Ms. Hutchins's corresponding answers (printed here in italics):

> Employer: *Stylab Salon*
> Position: *Owner/Stylist*
> Length of time in this position: *5 years (unpaid)*[46]

On another intake form that appears to have been completed at the same time, Ms. Hutchins lists her employment status as "self employed—own business, no income."[47] These are precisely the types of disclosure that one would expect Ms. Hutchins to have made on her SNAP applications, had she provided complete and honest answers consistent with her professed understanding of her role at Stylab. It also shows that Ms. Hutchins was capable of articulating the nature of her employment at Stylab. The fact that she disclosed this detail to her therapist, but withheld it from DHS, further supports a finding that the omission from her SNAP paperwork was intentional.

In addition to the testimony of Dr. Persky and Ms. Stines, I find that other evidence casts doubt on Ms. Hutchins's claim that she has difficulty accurately reporting factual information. For example, the record indicates that Ms. Hutchins was detailed and proactive in reporting income changes to DHS that could potentially increase her SNAP benefits.[48] Additionally, Defendant's tax preparer testified that he regularly contacted Ms. Hutchins to discuss business records and ask clarifying questions. During those interactions, he found Ms. Hutchins to be "always someone who was quick to respond, knew what was going on with her business, was able to explain any items that were complex or not normal. We always could rely on her to help us through and get good figures for the tax return." Finally, when DHS asked Ms. Hutchins for additional detail or verification of financial information, she typically understood the request and responded promptly,[49] and on one occasion she even provided detailed income information during a phone call when she "was in a rush and driving to work."[50] These examples all

---

[46] *Id.* at 14.

[47] *Id.* at 16.

[48] Pltf. Exh. L at 23 (in August 2014, Ms. Hutchins proactively reported her husband's loss of employment to DHS and provided documentary proof).

[49] *Id.* at 41-42 (providing several months worth of self-employment income data).

[50] *Id.* at 35-36.

Page 20 – OPINION

corroborate what the court observed during Defendant's testimony: Ms. Hutchins is smart, responsive, knowledgeable, and shows no signs of cognitive impairment.

In summary, I find the State's evidence concerning Defendant's intent to be substantially more reliable than the evidence introduced by Ms. Hutchins. Ms. Hutchins has produced uncontroverted evidence of her mental illness, yet when it comes to proving that the illness impairs her cognitive abilities, her evidence falters. Although Ms. Hutchins did provide some corroborating evidence (in the form of self-assessment and Ms. Stines's testimony), the credibility of this testimony is far outweighed by Dr. Persky's findings that are based on standard and reliable techniques of credibility evaluation.[51] I also find that the results of Ms. Hutchins's MMPI, as interpreted by Dr. Persky, are quite relevant. Although Dr. Persky did not definitively conclude that Ms. Hutchins was exaggerating her symptoms, Dr. Persky's testimony in combination with other evidence allows the court to find that Ms. Hutchins's PTSD does not impair her ability to accurately answer questions. In the context of Social Security disability eligibility, an administrative law judge may set aside medical testimony of expert witnesses based on test results (including the MMPI) and inconsistencies in the patient's testimony.[52] Here, the MMPI results, Dr. Persky's testimony, and the inconsistencies in Ms. Hutchins's self-assessment all support a finding that Ms. Hutchins omitted information with the intent to conceal facts from DHS. This evidence is more credible than the testimony of Ms. Hutchins and Ms. Stines.

## C. Reliance

Ms. Hutchins's attempts to cast doubt on the State's reliance are wholly unpersuasive. In brief, Ms. Hutchins chides the State for not consulting other sources of information (such as Department of Revenue databases) to investigate Ms. Hutchins's income and verify the information given on her application.[53] This theory lacks merit because for purposes of

---

[51] See Stauss v. Apfel, 45 F.Supp.2d 1043 (D. Or. 1999) (upholding Social Security ALJ's finding that psychological evaluations, including the MMPI, outweighed lay testimony regarding impact of applicant's disability).
[52] See Smith v. Apfel, 1998 WL 833621 (9th Cir. 1998) (unpublished) (when "MMPI results indicated that [applicant] may have been faking her impairment," ALJ was correct in discounting psychologist testimony in light of MMPI results and inconsistencies in the applicant's description of her disability).
[53] Pretrial Order ¶ D(2)(f) and (g).

Page 21 – OPINION

§ 523(a)(2)(A), a creditor need only show that its reliance was "justified," and is under no duty to investigate the debtor's representations.[54]   Indeed, the same argument advanced by Ms. Hutchins has been rejected by other bankruptcy courts in cases concerning overpayment of benefits.[55]

Ms. Hutchins admitted under cross examination that she completed her SNAP applications herself and affirmed under penalty of perjury that the statements made in the applications were true, correct, and complete.   The online application allowed Ms. Hutchins to submit the application while also checking a box stating that she did not understand the certifications she was asked to make.   If that box was checked, DHS would provide additional explanation during the eligibility interview.   But Ms. Hutchins did not check that box, nor did she testify at trial that she had any difficulty understanding the certifications.   Any reasonable person signing such a certification would realize that DHS intended to rely on the responses contained in the application, and I find that DHS's reliance in this case was justified as a matter of law.

## D.    Calculation of Damages

Upon discovering income that was omitted from Ms. Hutchins's SNAP applications, DHS calculated the amount of benefits that Ms. Hutchins received but to which she was not entitled (the "overpayment").[56]   Ms. Hutchins has advanced a compelling argument that the calculated amount of the overpayment is inaccurate.   But once again, Defendant's counsel oversimplifies this issue by appealing largely to the court's sense of fairness.   As explained below, this issue is much more complicated than simply declaring the State's calculations unfair.

---

[54] *Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 827 (9th Cir. 2002).
[55] *See U.S. v. Tucker (In re Tucker)*, 539 B.R. 861, 867 (Bankr. D. Idaho 2015) (argument that Social Security Administration should have discovered misrepresentation by comparing debtor's reported income with Internal Revenue Service records "is far too facile and assumptive to be given weight").
[56] Pltf. Exh. M.

### 1.     The Problem: Calculating Self-Employment Expenses

SNAP is a federally-created and -funded program administered by states.[57]  Eligibility for SNAP benefits is determined by reference to the applicant's household income.[58]  In particular, for purposes of SNAP, household income is defined as gross income less certain enumerated exclusions.[59]  As relevant here, one such authorized exclusion from gross income is "the cost of producing self-employed income."[60]  This calculation of self-employment expenses is the cause of a major dispute between the parties.  While Ms. Hutchins denies concealing information from DHS, she argues in the alternative that even if she did improperly withhold information, DHS has inaccurately calculated the amount of the overpayment.  To fully resolve this disagreement, I must first briefly describe the legal framework governing SNAP eligibility.

As explained above, the federal law that creates SNAP states that the eligibility of self-employed applicants is determined by taking their gross self-employment income and deducting the cost of producing that income (this is basically the same approach used for calculating federal taxes on self-employment income).  Of course, SNAP applications are processed year-round, and self-employed individuals often do not prepare precise financial statements throughout the year, so determining self-employment expenses prior to the preparation of the applicant's tax return can sometimes be challenging.  Presumably to address this difficulty, Congress amended the SNAP statute as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA").[61]  Section 812 of PRWORA requires the Secretary of Agriculture to "establish a procedure by which a State may submit a method . . . for the approval of the Secretary, that the Secretary determines will produce a reasonable estimate of

---

[57] "Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits," Cong. Res. Serv. Rpt. No. R42505 (rev. Apr. 11, 2018), *available at* https://crsreports.congress.gov/product/pdf/R/R42505.

[58] 7 U.S.C. § 2014(a).

[59] *Id.* § 2014(c) (gross income standard) and (d) (exclusions from income).

[60] *Id.* § 2014(d)(9).

[61] Pub. L. 104-193, 110 Stat. 2105 (Aug. 22, 1996).

Case 19-03086-tmb    Doc 151    Filed 03/23/21

[applicants' self-employment expenses] . . . in lieu of calculating the actual cost of producing self-employment income."[62]

After PRWORA was enacted, DHS submitted a proposal to the Secretary of Agriculture that outlined a simplified method for calculating SNAP applicants' self-employment expenses.[63] The Secretary, through the Department of Agriculture, approved the proposed method, and approved a subsequent request, approximately one year later, to slightly modify the method.[64] Ms. Hutchins makes no allegations that DHS failed to follow Oregon procedural law when issuing the rule that sets forth the new simplified calculation. The rule remains in effect today, and it forms the basis for the present dispute.

Oregon's rule (simplified to strip out details not relevant to the present case) provides as follows: if a self-employed SNAP applicant has no self-employment expenses, their expense deduction is zero; otherwise, the deduction is equal to 50% of the applicant's self-employment revenue.[65] This flat 50% deduction does simplify things, but as Ms. Hutchins has come to learn, it creates peculiar results for people with high-grossing businesses that are not very profitable. In Ms. Hutchins's case, her self-employment expenses during Stylab's first two years were close to the break-even point—that is, her expenses were roughly equal to her income. But under DHS's rule, she cannot deduct all of her self-employment expenses; she can only deduct an amount equal to 50% of the revenue.

Ms. Hutchins retained accountant William N. Holmes as an expert witness to testify on the problems with Oregon's rule and how it impacts Ms. Hutchins. Mr. Holmes testified that under the DHS self-employment-expense rule, DHS calculated the amount of the overpayment correctly. However, if Ms. Hutchins were allowed to deduct all of her self-employment expenses, as reported on her tax returns, Mr. Holmes found that the overpayment would have

---

[62] *Id.* § 812 (codified as 7 U.S.C. § 2014(m)).
[63] Pltf. Exh. JJ at 1-3.
[64] *Id.* at 4-8.
[65] Or. Admin. Rule 461-145-0930(5).

been $22,930 ($13,000 less than the amount that the State currently seeks to declare non-dischargeable).[66]

For purposes of § 523(a)(2), the exception to discharge extends to any legally enforceable obligation that arises from the transaction in which the debtor obtained money or property through misrepresentation.[67]  Accordingly, if Oregon's regulation concerning calculation of self-employment income is legally enforceable, then DHS is entitled to recoup the overpayment in the amount that it has calculated.  Alternatively, if the regulation is invalid, then this court may redetermine the amount of the non-dischargeable debt.

 I agree with Ms. Hutchins that the State's approach to calculating self-employment income is harsh when applied to people like herself who operate businesses with high gross receipts and low net profits.  But once again, I must reiterate that I do not have a roving commission to do equity—unfairness alone cannot form the basis for my ruling.  At trial, when asked what authority the court has to set aside DHS's duly promulgated regulations, Defendant's counsel responded that the regulation as applied here is "illogical and unfair."  While I agree with the criticism to an extent, counsel misstates my authority: both Oregon and federal law are clear that a court may not indiscriminately substitute its judgment for that of an executive agency that is acting pursuant to a statutory grant of authority.[68]  I must therefore decline Ms. Hutchins's invitation to invalidate administrative rules based on my own preferences, and instead apply established principles of administrative law.

## 2.      What Law Applies?

The first analytical step is to determine what law applies.  Ms. Hutchins challenges a regulation promulgated by the State, and the DHS (a State agency) is party to this suit.  Oregon law allows a party in a civil action to collaterally attack the validity of an administrative

---

[66] Def. Exh. 24 at 2.

[67] *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).

[68] *See e.g.*, *Miller v. Or. Liquor Control Comm'n*, 42 Or. App. 555, 561 (1979) ("[A]n agency's interpretation of its statutory authority is entitled to deference by the courts, and we cannot substitute our policy ideas for those of the agency."); *Cervantes v. Holder*, 772 F.3d 583, 591 (9th Cir. 2014) (in order to withstand judicial review, "[t]he agency's interpretation need not be the best construction of the ambiguous statute")

regulation.[69]  Thus, Ms. Hutchins's challenge is procedurally proper and the next step is to determine whether I should apply Oregon or federal law when deciding the challenge to the rule. SNAP eligibility is determined by federal law, but self-employment income is determined under an Oregon regulation.  This situation is not uncommon in the modern system of regulatory federalism, and Oregon law provides guidance: when an Oregon agency is exercising delegated power pursuant to a federal statute, the state agency's interpretation of a federal statute is reviewed using principles of federal administrative law,[70] most notably the well-known framework articulated in *Chevron v. Natural Resources Defense Council*.[71]  Thus, *Chevron* is the rule of decision that I must use here.

### 3.      Applying *Chevron* to the Facts of this Case

*Chevron* requires that I employ a two-step process in weighing Ms. Hutchins's challenge to DHS's simplified self-employment expense rule.  First, I must ask if the statutory text is unambiguous, and if it is, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[72]  On the other hand, if the statute is ambiguous, I proceed to the second step, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute."[73]

Turning to the first step, I can easily conclude that the relevant language in PRWORA § 812 is ambiguous.  While the law unambiguously requires the Secretary of Agriculture to allow states to establish simplified methods for calculating self-employment expenses, the substantive language used to determine whether such methods are allowable is inherently ambiguous: the simplified method must produce a "reasonable estimate" of expenses.[74]  Because "reasonable" is phrase susceptible to numerous different interpretations, the statute evidences Congress's intent to endow the Secretary with considerable discretion in approving proposed methods for

---

[69] *Hay v. Or. Dept. of Transp.*, 301 Or. 129, 135-136 (1986).
[70] *Friends of the Columbia Gorge v. Columbia River Gorge Comm'n*, 346 Or. 366, 377-378 (2009).
[71] 467 U.S. 837 (1984)
[72] *Int'l Bhd of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 851 (9th Cir. 2021) (quoting *Chevron*, 467 U.S. at 842-843).
[73] *Id.* (quoting *Chevron*, 467 U.S. at 843).
[74] 7 U.S.C. § 2014(m)(1).

simplified calculation.[75]  I also find Congress's use of the phrase "estimate . . . in lieu of calculating the actual cost" to be relevant.  Ms. Hutchins complains that DHS's rule does not allow her to deduct all of her expenses; however, by authorizing states to estimate self-employment expenses *in lieu of* actually calculating the amounts, Congress has explicitly endorsed scenarios where an applicant's eligibility will be determined based on some amount other than their actual expenses.  Nonetheless, under § 812, the estimate must be "reasonable," which I discuss in the next step of the analysis.

The second step under *Chevron* requires that I determine whether the agency's policy is based on a "permissible construction" of the relevant statute.  As noted above, PRWORA § 812 requires that procedures for estimating self-employment income be "reasonable."  In 1997, when DHS proposed estimating self-employment expenses at 50% of revenue, it did so based on a 1996 study of Oregonians who received Temporary Assistance for Needy Families ("TANF") benefits.  DHS took every member of the study sample who reported self-employment income and compared what their SNAP benefits would be using actual expenses versus using the flat 50% estimate.  DHS concluded that under the simplified method, the same subset of TANF recipients would receive benefits within 5% of what they would receive using actual expense figures.[76]  Of those sample members who would receive a different amount of benefits under the simplified rule, DHS concluded that for 86% of households the difference was $30 or less.[77]

The methodology used by DHS clearly results in some deviation from complete accuracy.  But the question is whether this deviation is "reasonable."  I conclude that it is, largely based on the Ninth Circuit's reasoning in *Gamboa v. Rubin*,[78] which is almost precisely on point. *Gamboa* involved the Aid to Families with Dependent Children program ("AFDC," the predecessor of TANF).  In 1981, Congress amended the AFDC statute to specify that applicants

---

[75] *See Hall v. U.S. Dept. of Agriculture*, 984 F.3d 825, 835 (9th Cir. 2020) ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." (*quoting U.S. v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).

[76] Pltf. Exh. JJ at 2-3

[77] *Id.* at 3.

[78] 80 F.3d 1338, 1343-1346 (9th Cir. 1996), *vacated sub nom. Gamboa v. Chandler*, 101 F.3d 90 (9th Cir. 1996) (en banc).

Page 27 – OPINION

would only be eligible for benefits if their household possessed assets of $1,000 or less.[79]  But

that same amendment allowed applicants to exempt the value of one automobile, up to a certain

limit.  Rather than specifying the exemption limit in statute, Congress directed the Secretary of

Health and Human Services to issue regulations setting the maximum exemption amount.[80]  In

1982, the Secretary issued rules setting the automobile exemption at $1,500, a figure based on

household finance data collected as part of a 1979 survey of food stamp recipients.[81]

     The plaintiff in *Gamboa* was ineligible for AFDC benefits because he owned a car that

pushed him over the asset limit.[82]  He challenged the Secretary's exemption calculations as

arbitrary and based on flawed data.[83]  Applying *Chevron*, the Court of Appeals found that the

$1,500 exemption, while based on imprecise and incomplete data, was reasonable.  In reaching

this conclusion, the court noted that it was joining four other circuits that had reached the same

result.[84]

     At this point, *Gamboa*'s history becomes more complicated for two reasons, neither of

which change my ultimate conclusion.  The first complication is that unlike other courts of

appeals that upheld the exemption limit, the Ninth Circuit held only that the $1,500 automobile

exemption was reasonable *when originally promulgated*.  The court went on to invalidate the

rule as unreasonable because it did not adjust the $1,500 exemption limit for inflation.[85]  This

detail is inapplicable here, because unlike the AFDC car exemption, DHS's rule for simplified

self-employment calculations prescribes a percentage, not an absolute dollar amount.   Here,

DHS relies on old survey data,[86] but Ms. Hutchins has produced no evidence indicating that the

---

[79] *Gamboa*, 80 F.3d at 1342.

[80] *Id.* (*citing* 42 U.S.C. § 602(a)(7)(B)(i)).

[81] *Id.*

[82] *Id.* at 1341.

[83] *Id.* at 1344.

[84] *Id.* at 1343.

[85] *Id.* at 1346-1349.

[86] I do not believe the age of the survey data imperils the validity of DHS's rule.  When speaking of the need to adjust for inflation, the *Gamboa* court indicated that a simple mathematical calculation (presumably based on the Consumer Price Index) would have been sufficient.  In other words, the court did not expect the Secretary to periodically conduct a new survey in order to update the exemption amount).  *See Gamboa*, 80 F.3d at 1347 ("We believe that periodically adjusting the automobile equity limit for inflation is the only reasonable way to achieve Congress's competing goals.").

ratio of self-employment expenses to income has materially changed since 1996. Because the 50% limit is expressed as a percentage, inflation is automatically "baked into" the simplified method, and I conclude that under the reasoning of *Gamboa*, DHS's flat-50% rule is a reasonable interpretation of PRWORA § 812.

The second issue that somewhat complicates *Gamboa*'s precedential weight is that the Ninth Circuit, sitting en banc, subsequently vacated *Gamboa* based on jurisdictional grounds.[87] But the ruling vacating the original opinion was based entirely on jurisdiction, and not on any flaw in the panel's *Chevron* analysis. None of the court's rulings in the intervening years indicate that the Ninth Circuit would employ a different analysis under *Chevron* than it used in *Gamboa*, and therefore I believe that, under the reasoning articulated in *Gamboa*, I must uphold the validity of DHS's simplified self-employment expense calculation.

## E.    Omissions Regarding Sidlab

As previous noted, the parties focused almost exclusively on the Stylab salon during trial, and as a result the above analysis is also focused on Ms. Hutchins's omissions regarding Stylab. But the State's complaint also alleges that Ms. Hutchins omitted her ownership of a second, smaller, business: Sidlab. Ms. Hutchins testified briefly about Sidlab, which appears to have been beset by various operational problems. Yet, at the end of the day, I hardly have any evidence on which to base a ruling.

The only facts in evidence regarding Sidlab are the organizational documents[88] and Ms. Hutchins's tax returns. Neither party alleges that the tax returns are inaccurate, so I will accept that data for purposes of my findings. The tax returns indicate that Sidlab produced revenue in three relevant years: 2013, 2014, and 2016. The amount of Sidlab's income is material (especially under DHS's simplified 50% rule). The only testimony concerning Sidlab came from Ms. Hutchins, and was quite sparse. She described the business as a "product company" that she purchased from the prior owner in early 2013. She said the business "sat there on autopilot," and she filled orders, but did not receive any money from the business. Ms. Hutchins also confirmed that her 2013 SNAP application stated that she ceased working for Sidlab on June 7, 2013.

---

[87] *Gamboa v. Chandler*, 101 F.3d 90 (9th Cir. 1996) (en banc).
[88] Pltf. Exh. Q.

But the information on the 2013 SNAP application is contradicted by the fact that the business continued to produce revenue through 2016, and Ms. Hutchins continued to report that revenue on her personal tax returns. Ms. Hutchins produced no evidence specifically explaining this contradiction. To the extent that Ms. Hutchins attributes the omissions to her inability to understand forms due to her PTSD, this argument fails for the same reasons discussed previously. Because the State has made a prima facie case regarding the Sidlab omissions, and Ms. Hutchins has failed to come forward with evidence rebutting the State's case, I find that Ms. Hutchins omitted her ownership interest in Sidlab with intent to conceal that income from DHS.

**F.    Section 523(a)(2)(B)**

The State further alleges that Ms. Hutchins concealed the existence of certain assets, and that the SNAP overpayment is also non-dischargeable under § 523(a)(2)(B). Because I have already found the entire overpayment to be non-dischargeable under § 523(a)(2)(A), I need not reach the State's claims under § 523(a)(2)(B).

**V.    Conclusion**

The facts of this case recall psychologist Lawrence Kohlberg's famous hypothetical known as the "Heinz dilemma." The hypothetical involves a woman, Mrs. Heinz, who is fatally ill. A new kind of drug may save her life, but it is only available from a pharmacist who demands an exorbitant price that the woman cannot afford. Mrs. Heinz's husband tries to borrow money or bargain with the pharmacist, but these attempts are unsuccessful, so he is ultimately forced to decide whether to steal the drug. In Kohlberg's study, a researcher would read the hypothetical scenario to children and then ask a series of follow-up questions. Among other themes, the follow-up questions ask the study participants to consider the difference between legal obligations and moral obligations. Stealing the drug is illegal, but some may argue that Mr. Heinz has a moral obligation to save his wife's life, even if it involves breaking the law.

To be clear, the facts of this case differ in many respects from the facts of the Heinz dilemma, but the analogy is undeniable. Instead of a dying spouse, Ms. Hutchins was faced with children to feed. Instead of a greedy pharmacist, she dealt with an imperfect state bureaucracy.

Instead of stealing a drug, she obtained SNAP benefits to which she was not entitled. Almost as if taking a cue from Kohlberg's work, Defendant's theory of this case relied on casting this proceeding as a battle over morals: emphasizing Ms. Hutchins's difficult situation and all but accusing DHS of trying to destroy her life. This is understandable as a litigation strategy, but it comes with a risk: namely, that in receiving this opinion, Ms. Hutchins might interpret the court's ruling as a judgment of her moral worth. That would be an unfortunate mistake.

As evidenced by the lengthy analysis above, this court takes this proceeding very seriously. The point of bankruptcy is to give debtors a "fresh start," and this court (like all bankruptcy courts) construes exceptions to discharge narrowly. But despite Ms. Hutchins's theory of the case, this is not a trial about morality. Rather, this is a legal proceeding, and the law in this area is well-developed. I can neither ignore the facts nor toss aside the law based on my desire to help Ms. Hutchins succeed in life.

Based on the evidence received, and under settled principles of law, I must find Ms. Hutchins's debt to DHS to be nondischargeable under § 523(a)(2)(A). This does not mean that Ms. Hutchins is a bad person, or that she is undeserving of sympathy. It merely means that the State has proven the elements of its case. Counsel for the State should submit a proposed judgment, in compliance with Local Bankruptcy Rule 9021-1, within fourteen days of the date of this opinion.

###

cc:    Carolyn Wade
       Laura Caldera